# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL SMITH | * | |
| Plaintiff | * | |
| v | * | Civil Action No. PJM-10-653 |
| WILLIAM FILBERT, et al. | * | |
| Defendants | * | |

***

## MEMORANDUM OPINION

Pending in the above-captioned case are Plaintiff's non-dispositive motions (ECF No. 53, 61, 78 and 85) and Motions for Summary Judgment (ECF No. 62, 70, and 77). Also pending is a Motion to Dismiss or for Summary Judgment filed on behalf of Defendants Alston, Anderson, Darden, Lygon, Sacchet, and Thomas (ECF No. 56). Plaintiff's Motion for Summary Judgment or Default is opposed by Defendant Crew (ECF No. 90). Plaintiff opposes the Motion to Dismiss or for Summary Judgment (ECF No. 60).

### Non-Dispositive Matters

Plaintiff filed a Motion for Appropriate Relief (ECF No. 53) opposing a Motion to Dismiss filed by Assistant Warden Naomi Williams (ECF No. 45). Plaintiff states that he technically did not name Williams as a Defendant, but wished to err on the side of caution and oppose her dismissal from the case. The Motion to Dismiss (ECF No. 45) was denied without prejudice by this Court on October 15, 2010, and in light of Plaintiff's admission that Naomi Williams was not involved in the events described in the Complaint, she was dismissed without prejudice from the case. The Court also granted Plaintiff's Motion to Clarify Defendants (ECF No. 47) so that the appropriate party could be located and served. Thus, the Motion for Appropriate Relief (ECF No. 53) shall be denied as moot.

In his Motion to Correct Defendants (ECF No. 61), Plaintiff seeks to substitute Warden Rouse for Warden Sacchet because Sacchet was not the warden of Maryland Correctional Institution at Hagerstown (MCIH) when Plaintiff was confined there. There has been no opposition to the Motion to Correct Defendants; accordingly, Plaintiff's motion will be granted. Rouse will be added as a Defendant and counsel will be asked to accept service of the Complaint on her behalf.

Plaintiff filed a Motion for Appropriate Relief (ECF No. 85) on March 29, 2011, asserting that Filbert should be required to identify the person Plaintiff refers to as "Major Williams" in the Complaint. Plaintiff states that since Filbert asserts Willie Jones is not the person referred to in the Complaint and since Filbert does not assert a lack of knowledge as to the true identity of "Major Williams," he should be required to provide the name of that individual. Plaintiff further asserts that Filbert did not rebut his assertions that another staff member was present on the day in question. The motion is in the nature of a discovery request and will be denied. To the extent Filbert knows the identity of the other person present as described in the Complaint, he will be required to reveal the identity of that person during discovery when it is ordered by this Court.

**Background**

On March 15, 2007, Plaintiff was returning to the Baltimore City Detention Center (BCDC) from a scheduled court appearance at Circuit Court for Baltimore City. ECF No. 1 at p. 4. Plaintiff alleges two of the inmates with whom he was transported were known gang members. One of the men Plaintiff characterizes as a gang member, Brian Medlin, engaged in a secretive conversation with Officer Crew prior to getting on the transportation van. Plaintiff states he witnessed Crew "slip" something to Medlin. Id. On the drive back to BCDC, Medlin

unlocked his restraints with two different keys, produced a home-made knife, and began hitting and stabbing Plaintiff repeatedly.[1]

Plaintiff claims he was escorted to the BCDC infirmary where he made repeated pleas to Warden Filbert to be immediately transferred to a hospital. Plaintiff claims Warden Filbert was in the infirmary the entire time and he got "annoyed" with him due to his emphatic requests to be hospitalized. ECF No. 5. Plaintiff states that he was placed in isolation without medical attention by Filbert, who justified putting him in isolation by claiming Plaintiff refused medical care. Plaintiff claims he suffered contusions, deep lacerations, stab wounds and head trauma as a result of the assault. While in isolation, Plaintiff was found unconscious at approximately 12:30 a.m. and was rushed to Johns Hopkins Hospital Emergency Room for treatment of multiple stab wounds which required sutures. ECF No. 1 at Ex. A, p. 4.

On March 20, 2007, Plaintiff was transferred from BCDC to Maryland Reception Diagnostic Classification Center (MRDCC) where he claims he made "any and all staff" aware of the existing threat to his safety in the form of a contract on his life. ECF No. 1 at p. 5. Plaintiff states he requested placement on protective custody, but he was not so assigned.

On March 25, 2007, Plaintiff filed an administrative remedy procedure complaint (ARP) detailing the facts of his assault at BCDC and requesting placement on protective custody. On March 27, 2007, Plaintiff met with Ms. Darden, a classification worker, and described the assault he suffered, explained there was a "hit" placed on Plaintiff by Officer Crew, and again requested placement on protective custody. During the meeting Darden brought Lt. Thomas into the room to speak with Plaintiff and Lt. Thomas placed Plaintiff on administrative segregation. ECF No. 1 at pp. 5 – 6.

---

[1] Plaintiff claims the whole incident was "captured on video, as a MPT Television crew was on-site filming the transportation of inmates." He states the response team that was being filmed stopped the transport van and intervened in the assault. ECF No. 1.

On March 28, 2007, Plaintiff met with another case manager, Ms. Alston. Plaintiff again described the details of his assault and requested placement on protective custody. Alston recommended that Plaintiff instead remain on administrative segregation. On April 2, 2007, Plaintiff appealed the decision not to place him on protective custody to the Inmate Grievance Office (IGO). Plaintiff states that although his appeal was received by the IGO on April 10, 2007, he did not receive a response acknowledging his correspondence until June 13, 2007.

On April 4, 2007, Plaintiff was transferred to Maryland Correctional Institution at Hagerstown (MCIH). When he arrived Plaintiff explained to the receiving officer that he had been assaulted at BCDC, that a hit had been placed on his life, and that he wanted to go on protective custody. Plaintiff was told to take his concerns up with classification and was sent into general population the next day. ECF No. 1 at p. 6.

On April 5, 2007, less than 24 hours after Plaintiff arrived at MCIH, he was viciously assaulted in the dormitory area by a group of unknown individuals. Plaintiff was taken to the hospital for his injuries. At that time Plaintiff explained to Lt. Anderson what had happened to him previously and Anderson placed Plaintiff on administrative segregation. On April 6, 2007, Plaintiff wrote a letter complaining to the Warden of MCIH and requesting to be placed on protective custody.

On April 12, 2007, Plaintiff met with Mr. Lygon, a case manager. Plaintiff explained the dangers to his physical safety and requested protective custody. Case management decided instead to leave Plaintiff on administrative segregation pending transfer to another institution. Plaintiff filed an ARP on April 10, 2007, at MCIH which was dismissed by administrative remedy coordinator Mark Myers. ECF No. 1 at p. 7.

On June 1, 2007, Plaintiff was transferred from MCIH to Brockbridge Correctional Facility (BCF). Upon arriving at BCF Plaintiff explained his history of being assaulted as well as the existing hit that had been placed on him by Officer Crew, and he again requested placement on protective custody. Plaintiff was told he would need to bring the matter to the attention of the day shift on the following Monday.[2] The following day Plaintiff was assaulted. He was stabbed in the right eye and the head several times. He was also beaten about the head with locks. Plaintiff's injuries were severe enough to warrant his immediate transfer to Jessup Correctional Institution (JCI) hospital where he remained for one week. ECF No. 1 at p. 7; Ex. C.

Plaintiff was again transferred, this time to Central Laundry Facility (CLF). Upon arrival Plaintiff refused to go into general population based on his previous assaults. He explained the basis of his fears and request protective custody placement. In response Plaintiff was transferred to Maryland Correctional Institution at Jessup (MCIJ), where Plaintiff again attempted to address his complaints through the grievance procedure. At MCIJ Plaintiff was assigned to administrative segregation and subsequently put in the Central Protective Custody Unit at the Western Correctional Institution (WCI).

Plaintiff seeks compensatory and punitive damages as well as declaratory relief for the alleged failure to protect him from violence. He states he can no longer see out of one eye and has numerous facial scars as a result of the assaults he suffered.

---

[2] June 1, 2007, was a Friday.

Defendants Alston, Anderson, Darden, Lygon, Joseph P. Sacchet,[3] and Thomas are now or were employed by the Maryland DOC during the period covered by the Complaint. The allegations against them concern the events taking place after Plaintiff left BCDC. Defendants admit that Plaintiff told Debora Darden during his intake interview at MRDCC, that he had been stabbed and that he wanted to be assigned to protective custody. ECF No. 56 at Ex. 3. The intake interview took place on March 27, 2007, and Plaintiff arrived at MRDCC on March 20, 2007. *Id*. at Ex. 1 and 2. Darden does not recall Plaintiff claiming that a correctional officer was involved in facilitating the attack. *Id*. at Ex. 3. Upon hearing Plaintiff's request for protective custody, Darden had Lt. Ronald Thomas interview Plaintiff and had no further contact with Plaintiff. *Id*.

Lt. Thomas interviewed Plaintiff on March 27, 2007, and spoke with him regarding his concerns for his safety. ECF No. 56 at Ex. 5. Thomas recalls that Plaintiff told him he had been attacked while on a DOC van that was traveling to BCDC after a court trip. Plaintiff related that an inmate he knew as "BG" had a key which he used to come out of his restraints, produced a knife, and stabbed Plaintiff repeatedly in the head. *Id*. Plaintiff related that his assailant was a member of the Bloods gang. Thomas also does not recall Plaintiff stating that a correctional officer was involved in the assault. Upon learning the details of Plaintiff's assault, Thomas contacted BCDC and spoke with the Warden's secretary who advised that the assault in question was under investigation by the Internal Investigative Unit (IIU). *Id*. Because Plaintiff's allegations were serious, Thomas placed Plaintiff on administrative segregation pending consideration for placement on voluntary protective custody. Defendants relate that MRDCC does not have "protective custody," but it is the practice there to place inmates who express

---

[3] Sacchet was named as a Defendant because Plaintiff was under the impression he was the warden of MCIH at the time he was confined there. Plaintiff has filed a motion to substitute Warden Rouse for Sacchet in light of the fact that Sacchet had retired by the time Plaintiff arrived at MCIH.

6

concerns about their safety on administrative segregation while they are there. *Id.* Thomas had no further contact with Plaintiff after the interview and subsequent assignment to administrative segregation. *Id.* On March 28, 2007, a case management team[4] conducted a review of Plaintiff's administrative segregation assignment and, upon verifying the BCDC assault, recommended that he remain on that status until he was transferred. *Id.* at Ex. 7.

On April 4, 2007, Plaintiff was transferred to MCIH and was assigned to general population. ECF No. 56 at Ex. 9. The following day at approximately 3:00 p.m., Plaintiff informed Officer Jeffrey Royce that he wanted to be placed on protective custody. *Id.* Royce claimed he noticed a bump on the back of Plaintiff's head while he was escorting him to Lt. Anderson's office. Defendants claim it was not until Plaintiff was being interviewed by Lt. Anderson that he told the officers someone had struck him in the back of the head while he was standing at his locker. *Id.* at pp. 7 – 8. Plaintiff was unable to identify his assailant or the instrument used to strike him.[5] *Id.* Plaintiff received three sutures for the injury to his head at the MCIH hospital and was placed on administrative segregation until it could be determined that he "can live safely" in general population. *Id.* at pp. 7, 9 – 10, 14 and 16.

On April 12, 2007, Plaintiff's assignment to administrative segregation was reviewed by a case management team, including Correctional Case Management Specialist Kirk Layton. ECF No. 56 at Ex. 11. The team recommended that Plaintiff remain assigned to administrative segregation and the recommendation was approved by Warden Rouse. Layton states that because Plaintiff "did not provide a specific name of the person who assaulted him" no entries were made on his "enemies list." On May 9, 2007, the case management team again reviewed

---

[4] Defendant Alston was a member of the case management team. After review of Plaintiff's assignment, she had no further contact with him. ECF No. 56 at Ex. 7.
[5] Pictures were taken of Plaintiff's injury but the copies submitted with Defendants' motion are too dark to discern any detail. ECF No. 56 at Ex. 9, pp. 12 -- 13.

Plaintiff's status and recommended that he be placed on a transfer list to any minimum security facility, remaining on administrative segregation until he was transferred. *Id*. Layton claims Plaintiff did not object to being transferred or being removed from administrative segregation on the date he was to be transferred. *Id*.

Plaintiff was transferred to BCF on June 2, 2007, as a general population inmate. ECF No. 56 at Ex. 12 at p. 5. Defendants do not deny that Plaintiff was assaulted at BCF, but admit there are no records reporting the assault other than medical documentation of his stay in the former Maryland House of Correction Hospital dated June 4 and 5, 2007. *Id*. at Ex. 13. Those records reflect that Plaintiff was suffering "head discomfort" and lacerations. Also noted are the sutures Plaintiff was given as well as the need for the use of neck brace during his stay at the hospital. The records provided are partial records consisting only of nursing notes. *Id.* Plaintiff has provided most of the missing medical records with his Complaint. ECF No. 1 at Ex. C. Those records make it clear that Plaintiff required emergency medical care at the University of Maryland following assault by another inmate. Plaintiff suffered a concussion, facial contusions and lacerations, and was required to wear a cervical collar for two weeks as a part of his medical care. *Id*. In addition, Plaintiff suffered a subconjunctival hemorrhage, causing loss of vision. In short, it is clear from the records submitted that Plaintiff suffered an assault resulting in serious injuries.

Plaintiff was transferred to Central Laundry Facility (CLF) on June 7, 2007, where case management staff noted that he arrived wearing a hospital bracelet and suffering a swollen right eye. ECF No. 56 at Ex. 14, p. 3. Plaintiff requested protective custody when he arrived at CLF, explaining that he had been "assaulted at every jail he's been in by the Bloods." *Id*. at pp. 1 – 4. Plaintiff was transferred from CLF to MCIJ on the same day he arrived. He was placed on

administrative segregation pending placement on protective custody at MCIJ. *Id*. at Ex. 2, p. 3. Plaintiff remained on administrative segregation at MCIJ until July 26, 2007, when he was transferred to Western Correctional Institution (WCI) and assigned to long-term protective custody. *Id*. at Ex. 15. On November 6, 2007, Plaintiff was transferred to Eastern Correctional Institution (ECI) with the same assignment to long-term protective custody.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

<u>Exhaustion</u>

Defendants allege Plaintiff failed to exhaust administrative remedies with respect to his claims regarding assignment to protective custody within the DOC facilities. ECF No. 56. The PLRA provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As a prisoner, Plaintiff is subject to the strict requirements of the exhaustion provisions. It is of no consequence that Plaintiff is aggrieved by a single occurrence, as opposed to a general conditions of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this Court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir.2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir.2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir.2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

Defendants premise their claim that Plaintiff has failed to exhaust administrative remedies on the declaration under oath by Scott Oakley, the Executive Director of the Inmate Grievance Office (IGO). ECF No. 56 at Ex. 16. Oakley states that there were two ARPs filed by Plaintiff regarding the events outlined in the complaint. Those ARPs were assigned the numbers MCIH-0528-07 and MRDCC-0168-07. *Id*. He further claims that his review of IGO records reveal that Plaintiff filed two grievances with the IGO. One, filed on December 3, 2007, concerning ARP-MCIH-0528-07, was assigned IGO No. 20072715. Oakley states the complaint involves Plaintiff's claim that he was assaulted by a group of unknown inmates on April 5, 2007, at MCIH. The complaint was dismissed on December 21, 2007, because Plaintiff "failed to respond to a letter from the IGO requesting that he provide copies of ARP paperwork demonstrating that he properly exhausted the ARP process." *Id*. Oakley does not provide a copy of the dismissal letter for the Court's review.

The other IGO complaint Oakley includes in his declaration was also filed on December 3, 2007, and concerned an appeal of ARP-MRDCC-0168-07. Oakley indicates the complaint was about the assault Plaintiff suffered on March 15, 2007, by another inmate when they were

returning from court. Oakley concludes that "[t]his grievance was administratively dismissed on December 6, 2007 for a variety of reasons." *Id*. Again, Oakley does not provide a copy of the letter dismissing Plaintiff's grievance leaving the "variety of reasons" to the Court's imagination.

Exhibits attached to Plaintiff's Complaint included copies of ARPs and other correspondence, including correspondence to and from Mr. Oakley. ECF No. 1 at Ex. B and C. To the extent Defendants are relying on the non-exhaustion of administrative remedies concerning events which occurred at BCDC, the defense fails. As noted by Mr. Oakley in correspondence dated December 5, 2007, in which he dismisses Plaintiff's grievance (IGO 20072712)[6] the IGO does not have jurisdiction over employees of BCDC. ECF No. 1 at Ex. B, pp. 15 – 16. Additionally, none of the Defendants moving for summary judgment are alleged to have been involved in the events taking place at BCDC.

With respect to the allegation that Plaintiff has filed only two ARPs, both of which were dismissed for unknown reasons, it is clear from the record that Plaintiff filed additional ARPs. Oakley himself notes, in two letters addressed to Plaintiff a total of three other IGO grievances not referenced in his declaration claiming Plaintiff has not exhausted administrative remedies. *See* ECF No. 1 at Ex. B, pp. 15 – 16 (letter concerning IGO 20072712 and referencing IGO 20070740) and Ex. C, pp. 23 – 24 (letter concerning IGO 20072713 and referencing IGO 20070740). Second, there are ARPs provided by Plaintiff that reference other ARPs he has filed that are not mentioned in Oakley's declaration. *See Id*. at Ex. B, pp. 4 – 7 (ARP MCIH 0528-07 concerning assault at BCDC; dismissed as untimely), p. 13 (letter to IGO stating MCIH 0528-07 was submitted earlier with no response, then dismissed as untimely), Ex. C, p. 14 (ARP MCIJ0229-07), pp. 19 – 22 (letter describing efforts to receive responses from ARPs). The

---

[6] The Court notes that Mr. Oakley's declaration under oath neglects to mention this grievance with respect to his review of records.

apparent inaccuracies in the IGO records gives the Court pause, but the substance of the dismissals received by Plaintiff are more troubling.

Plaintiff's complaints filed with the IGO are clearly written; he is stating that he has told correctional officials that he is the target of a prison gang and has requested protective custody without results. ECF No. 1 at Ex. B and C. The complaints administratively dismissed by Mr. Oakley characterizes his claim as stating a preference for protective custody over administrative segregation. Citing *Sandin v. Conner*[7] and its progeny, Oakley states no due process claim is presented and concludes that Plaintiff has failed to establish a significant departure from applicable Division of Correction Directives (DCD). *Id*. at Ex. B, pp. 15 – 16 and Ex. C, pp. 23 – 24. In addition, Oakley views Plaintiff's claim as moot because at the time of the dismissal he had been assigned to long-term protective custody. *Id*. Thus, it appears Plaintiff was without a remedy for the past conduct of correctional staff who may have failed to recognize a pervasive risk of harm to his safety resulting in numerous, serious assaults resulting in permanent injuries.

In light of the record, the Complaint will not be dismissed for failure to exhaust administrative remedies. It is evident to the Court that Plaintiff utilized the administrative remedy provisions to the best of his abilities and he is not to be held accountable for the abject failures present in this case. The claims with respect to the DOC Defendants have been adequately exhausted.

<u>Failure to Protect</u>

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987). "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner

---

[7] 515 U. S. 472 (1995).

by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833– 34 (1994) (citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id* at 837; s*ee also Rich v. Bruce*, 129 F. 3d 336, 339– 40 (4th Cir. 1997).

It is undisputed that Plaintiff was targeted, possibly by a correctional employee, and assaulted by other inmates. Plaintiff asserts he told every correctional employee he encountered that a "hit" had been placed on him by Officer Crew; that the Bloods were out to get him; and that he wanted to be assigned to protective custody. ECF No. 1. Defendants dispute that Plaintiff told them a correctional officer put a hit out on him and that Plaintiff did not object to being transferred as a general population inmate. ECF No. 56. Who knew about the risk of harm to Plaintiff and what they did in light of that information is essential to determining whether or not an excessive risk was ignored. This dispute is a genuine dispute of material fact precluding summary judgment in favor of either Defendants or Plaintiff, as this Court cannot determine the credibility of the parties' assertions on summary judgment.

Additionally, the issue of whether the DOC Defendants are entitled to avail themselves of a qualified immunity defense will to a great degree turn on the determination of how much Defendants knew and when they knew it. "[Q]ualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for

transgressing bright lines.'" *Gomez v. Atkins*, 296 F. 3d 253, 261 (4th Cir. 2002), quoting *Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992). If the DOC Defendants knew there was an unreasonable, pervasive risk to Plaintiff's physical safety and did nothing in light of that knowledge, they have not made a bad guess in a gray area.

Accordingly, the motions for summary judgment filed by Plaintiff and Defendants shall be denied. Plaintiff's Motion for Appointment of Counsel shall be granted. A separate scheduling Order governing the further progress of this case shall be issued after counsel is appointed.

A separate Order follows.

June 6, 2011

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE